1

```
 1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA,    )  Case 1:14-cr-00397
                                  )
 4              Plaintiff,        )
                                  )
 5         v.                     )  Alexandria, Virginia
                                  )  September 17, 2015
 6   DAVID E. BURKE,              )  9:04 a.m.
                                  )
 7              Defendant.        )
     _____)  Pages 1 - 37
 8

 9                    TRANSCRIPT OF SENTENCING

10          BEFORE THE HONORABLE ANTHONY J. TRENGA

11            UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   FOR THE PLAINTIFF:

14        KELLEN S. DWYER, ESQUIRE
          OFFICE OF THE UNITED STATES ATTORNEY
15        2100 Jamieson Avenue
          Alexandria, Virginia  22314
16        (703) 299-3700

17   FOR THE DEFENDANT:

18        MARC AGNIFILO, ESQUIRE
          BRAFMAN & ASSOCIATES, PC
19        767 Third Avenue, 26th Floor
          New York, New York  10017-2023
20        (212) 750-7800

21        STUART A. SEARS, ESQUIRE
          SCHERTLER & ONORATO, LLP
22        575 7th Street, N.W.
          Suite 300 South
23        Washington, D.C.  20004

24   THE DEFENDANT, DAVID E. BURKE, IN PERSON

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1          THE CLERK:  Criminal Case 1:14-cr-397, *United*
2  *States of America v. David E. Burke*.
3          Will counsel please note their appearances
4  for the record.
5          MR. DWYER:  Good morning, Your Honor.  Kellen
6  Dwyer for the United States.
7          THE COURT:  Good morning.
8          MR. AGNIFILO:  Good morning, Your Honor.
9  Marc Agnifilo for David Burke with Stuart Sears as
10 well.
11          THE COURT:  All right.  Welcome.
12          We're here for sentencing.  Have you provided
13 a copy of the presentence report to Mr. Burke, and have
14 you reviewed it with him?
15          MR. AGNIFILO:  I have, Your Honor.  Thank
16 you.
17          THE COURT:  All right.  Any objections other
18 than what's in your filings?
19          MR. AGNIFILO:  Only in the filings, Judge.
20          THE COURT:  All right.  Do you want to be
21 heard any further on your objections?
22          MR. AGNIFILO:  Yes, briefly.  Thank you,
23 Judge.
24          We have two guidelines-based objections, and
25 I suppose they're somewhat related.  The heart of the

1  issue, Judge, is that Mr. Burke was -- essentially, he

2  was a salesman.  That's what he was.  He didn't run

3  this company.  He didn't truly have any independent

4  discretion over how the company ran.  He basically had

5  to do everything at the behest of the person who was

6  the principal of the company, who was his direct boss,

7  this person named Tzvi Lexier.  So he really didn't

8  have any independent discretion.

9           I know I make these arguments in my papers.

10 I don't want to belabor them, but I think it relates

11 both to the role in the offense and also to the amount

12 of loss that is going to be attributed to Mr. Burke.

13          I think at the end of the day, Mr. Burke

14 didn't really have any way of knowing the full amount

15 that Tzvi Lexier and the company as a whole was making.

16 So just for under principals of relevant conduct,

17 that's why I asked, Your Honor, to keep the loss amount

18 at essentially the commissions that Mr. Burke he,

19 himself, made.

20          So the two issues, I suppose, are related.  I

21 know we go into this at length in our papers.  I don't

22 need to belabor it at this point.

23          Thank you, Judge.

24          THE COURT:  Counsel, any objections?

25          MR. DWYER:  No, Your Honor.

1                If I could be heard in response.

2                THE COURT:  All right.

3                MR. DWYER:  First, on Mr. Burke's leadership

4    role, he was the director of sales and trained and

5    supervised the rest of the sales staff.  He also

6    provided detailed instructions to the drop-shippers and

7    coordinated the shipping from overseas to the American

8    drop-shippers and eventually to the clients.  He also

9    gave advice to the overseas shippers about how they

10   could sneak these drugs and devices past U.S. Customs.

11               From the papers, the defense has the idea

12   that because the Lexiers owned the company and

13   Mr. Burke didn't that he can't have a leadership role.

14   That's legally incorrect.  You don't have to be an

15   owner of a company.  You don't even have to be the

16   highest person in an organization to have a leadership

17   role.  That's why the enhancement says that there's a

18   4-point enhancement if you're an organizer and leader,

19   not the organizer or leader.

20               Mr. Burke ran the day-to-day operations.  The

21   company was owned by the Lexier family.

22               THE COURT:  It wasn't clear to me what that

23   exactly meant in the filings, his involvement in the

24   day-to-day operations.

25               MR. DWYER:  Sure.  If I could give you maybe

1  a little bit on the structure of the organization.

2  THE COURT:  All right.

3  MR. DWYER:  Dr. Lexier and his wife, Sophie,

4  owned the company but had very little involvement at

5  all.  Their son, Tsvi Lexier, was the CEO and also had

6  an equity interest.  The very next person below that is

7  Mr. Burke.  Mr. Lexier was not nearly as hands-on as

8  Mr. Burke was.

9  As I said, Mr. Burke worked out of Toronto,

10  supervised the sales staff, the people who would

11  actually call and try to get clients.  Then when they

12  got an order, Mr. Burke would coordinate with the

13  overseas shippers who would ship the drugs to the

14  drop-shippers in the United States, like David Stein

15  and Rivka Rabi.  These people are getting direct orders

16  from Mr. Burke.  We included some messages in our

17  papers.

18  THE COURT:  Right.

19  MR. DWYER:  There's many, many more where

20  Mr. Burke is contacting David Stein every day saying,

21  What about this shipment?  Has this gone out?  Has that

22  gone out?  He's contacting Rivka Rabi, who Your Honor

23  has gotten to know a little bit.  She was no leader.

24  She was taking direct orders from Mr. Burke.

25  So in terms of kind of who everybody in the

1  organization would report up to, it would be Mr. Burke.

2  Very few of them had direct contact with Tzvi Lexier.

3  The only person who had much contact with Tzvi Lexier

4  was Burke.  You'll see in a text message just weeks

5  before he was arrested, Mr. Burke himself says, I've

6  been the most influential part of this company since

7  day one.

8         This is reflected in the salary that he made.

9  Mr. Burke actually made more money from the company

10  than Tzvi Lexier and almost as much as Tzvi Lexier,

11  Reuven Mirlis, and Sophie Lexier put together.

12  Mr. Burke made $1.3 million versus $900,000 that Tzvi

13  made, $415,000 that Reuven made, and Sophie wasn't paid

14  any money.  She was just kind of on the board as a

15  figurehead.

16         So, you know, the idea that Mr. Burke was

17  just kind of following orders and didn't have any

18  discretion just doesn't fit the facts.

19         If I can be heard briefly on the loss amount.

20         THE COURT:  Yes.

21         MR. DWYER:  The company as a whole made over

22  $30 million in proceeds.  The government has stated

23  that the enhancement should be 20 points for a loss

24  between 7 and 20 million.  There's any number of ways

25  to get to that number, but probably the least

1  controversial is that --

2          You know, Mr. Burke admits that he made

3  $1.3 million.  He admits that that was almost entirely

4  from commissions.  So even if he were just looking at

5  the drugs that he himself sold to make those

6  commissions, that's easily over $7 million because the

7  commission, from our understanding, is somewhere

8  between 15 and 20 percent of the sales.

9          If you're making $1.3 million in commission,

10 you're selling way over $7 million in drugs, and that's

11 not even counting the rest that was foreseeable as

12 someone who was overseeing others.

13         Finally, if I could just briefly be heard on

14 the comparison to the Gallant sentencing.  In the

15 papers, Mr. Burke said that he should be compared to

16 Mr. Rochelle, who was a salesman at Gallant who was

17 recently sentenced to 12 months.  Mr. Rochelle, first

18 of all, had a 5K motion because he was a cooperator.

19 Mr. Rochelle only made $80,000 in commissions versus

20 $1.3 million for Mr. Burke.

21         THE COURT:  All right.  Thank you.

22         Counsel.

23         MR. AGNIFILO:  If I could, Your Honor.  Thank

24 you.

25         THE COURT:  Yes.

1          MR. AGNIFILO:  I don't want to put too much

2  emphasis on the formal corporate structure because I

3  don't know that that's really here nor there.  I mean,

4  he had no role in the formal corporate structure

5  whatsoever.  He was just a salesman.  To say that he

6  was the manager of the sales force, he did have that

7  title, but he had no equity in the business.  I don't

8  know at the end of the day -- I don't know what the

9  Lexiers' personal finances are, but I think as owners

10  of the business, there's probably ways of them

11  realizing income from the business that they

12  essentially owned without it being deemed a salary.

13          The point that, I think, is important is that

14  he -- at most, Mr. Burke is a mid-level type executive.

15  I mean, there's nothing he can do truly on his own.

16  Everything he does is at the whim of Tzvi Lexier, and I

17  think the e-mail -- rather, the text message that the

18  government refers to is a revealing one.  It's David

19  Burke essentially begging Tzvi to view him as valuable,

20  and there's two components to it.  The government

21  focuses on, I guess, the self-aggrandizing component:

22  Look, Tzvi, I've been good for the company.  I help

23  you.  I do a lot of things.

24          But the reading between the lines, I think,

25  is really the heart and soul of that communication

1  which is I need you, my boss, to recognize me.  I want

2  you, my boss, to recognize me.  I mean, there's a clear

3  superior/inferior position between those two people,

4  which is why he's sending that message basically asking

5  Tzvi to recognize him as a valuable member of the

6  company.

7           He was a valuable member of the company

8  certainly, but here he is talking to his boss.

9  Obviously, he's feeling he's not getting the

10 recognition that he deserves, and the point of the fact

11 that he's even looking for this recognition is that

12 he's looking for recognition from someone who is

13 clearly a superior.  I mean someone who can fire him,

14 who can reduce his commissions, who can increase his

15 commissions.  I mean, there's really nothing that David

16 Burke is doing truly on his own.

17          He was an active salesman.  I mean, the one

18 thing, I think, that we probably agree with the

19 government on is he was the most prolific, the most

20 active, the most successful salesman in the company.  I

21 think we agree on that, and I think that's common

22 ground.

23          In terms of the overall decision-making for

24 the company, direction of the company, I mean, at one

25 point -- I know I reference it in my papers a few times

1   because I think it's a significant point -- Tzvi Lexier

2   seems to start another business in Montreal other than

3   the business he has in Toronto, and he has three known

4   principals -- I don't identify them in the public

5   filing -- meet with David Burke basically so Burke

6   could tell them, This is how you sell product.

7           Now, on the one hand, you could say, Oh,

8   David Burke is playing some supervisory type role, but

9   it really isn't because he has nothing to do with the

10  Montreal business.  That's all the Lexier family.  The

11  Lexier family decided, as a matter of overall corporate

12  governance, to start another business in Montreal that

13  has nothing to do with Burke.  So it's just one of the

14  ways of highlighting the discrepancy in the different

15  roles.

16          I think what's also significant, Judge, is

17  David Burke -- and I know that the rough equivalent of

18  David Burke in the Gallant Pharma case got an actual

19  5K.  We, quite frankly, tried get a 5K, and it didn't

20  work out.  I think the reason it didn't work out is

21  itself somewhat significant.  The first thing that

22  David Burke did when he was arrested is he spoke with

23  the agents.  He was on the plane to Florida to see his

24  father.  He gets arrested.  He speaks with the agents.

25  He speaks with the agents, I think, at fair length and

1   gives them a lot of details.  The initial word from the

2   government was that this was valuable information and

3   we're going to pursue it.

4            The problem is that Mr. Burke was arrested in

5   Florida.  He was in Florida for a number of days.  Just

6   the way the Bureau of Prisons gets folks around the

7   country, he was in Florida.  Then he was in Oklahoma

8   City.  Then he was in Atlanta.  We just couldn't quite

9   get it all set up -- and it's difficult to do when a

10  prisoner is in transit -- to have another interview.

11  By the time he got to Virginia -- and I don't say this

12  through faulting the government in the least.  I think

13  the government had him in and listened to him.  But by

14  the time he got to Virginia, the government didn't need

15  him.  I think others had stepped up, others who were

16  lower in the food chain than Mr. Burke, and the

17  government made a decision that the government often

18  does, that we're going to use these folks and we're not

19  going to use this guy.  That's basically what happened.

20           Nonetheless, we brought Mr. Burke in to the

21  government.  We were there for many, many hours, and I

22  think he provided important information.  I don't know

23  because the government does their things.  And I don't

24  always know what the government does, and it's not my

25  business.  But I know that he provided important

1   information, I think, that went to the companies.  At

2   the end of the day, the companies pleaded guilty, and

3   others pled guilty in this case.

4          I'm not saying that it's because of

5   Mr. Burke, but I know that Mr. Burke -- because I sat

6   in the meeting -- gave a tremendous amount of

7   information that, I think, was critical as part of the

8   government's case against the company.  Not that the

9   government maybe didn't have similar information in

10  texts or from other folks, but I think Mr. Burke is

11  uniquely positioned to give information against Tzvi

12  Lexier and the Lexier family.  And he did.  That's

13  information that the government has.

14         It's my belief at this point that Mr. Lexier

15  was arrested in Canada and is awaiting extradition to

16  the United States.  I think that will certainly round

17  out the case.

18         I think the all-important question, the

19  question that I've asked myself, and the question I've

20  tried to prepare for Your Honor -- because I think Your

21  Honor would certainly want to know the answer -- is at

22  some point, obviously, Mr. Burke knew this was an

23  illegal business.  Maybe in the beginning he didn't

24  quite know.  Maybe it wasn't clear.  Maybe he had sort

25  of drank the proverbial Kool-Aid in the beginning, but

1  at some point, he knew.  He knew flat out, and

2  everybody knew flat out.  I don't know what the

3  position of the other defendants are on the case, but

4  at some point, everybody in this business knew it was

5  flat-out illegal.  He did too, and he stayed.

6         The question, when I'm asking Your Honor for

7  a lenient sentence, is how do I fill that void.  What

8  do I say to Your Honor in light of that to convince the

9  Court to give him a lenient sentence?  I think a lot of

10 things go into this.

11        I think the first thing is there was a

12 measure of self-esteem he got from this job.  It is,

13 really, the first thing he ever did well in his life.

14 He is someone who struggled in school.  He had learning

15 differences.  I don't mention that just for the

16 merciful aspect of someone with learning differences,

17 but I think it plays a role in the decisions that he

18 made.  He had a hard time in school.  His parents had

19 to hire a lawyer for him to even stay in school.

20        Then he goes, and he works for the Lexiers.

21 He's a salesman, and in the beginning, he thinks it's

22 legitimate.  Then he thinks, well, maybe it's not fully

23 legitimate, but it seems like maybe it's a gray area.

24 I think that's a term that I've heard a lot in this:

25 It's a gray area.

1           After the Gallant Pharma case, no one can

2    really think this is a gray area anymore.  Everyone can

3    only really see this case for what it was, which is at

4    this point it's illegal.  Whether there's a way of

5    doing this legally or not, I don't know.  But here it

6    wasn't being done legally.  It was being done through

7    different manners of deception.  He knew that, and he

8    didn't leave.

9           The two primary reasons he didn't leave:

10   One, he was making money for the first time in his

11   life, and his family needed the money.  His wife needed

12   the money.  He needed the money.  He was having

13   expensive fertility treatments.  He started at this job

14   when he was living in his father's basement.  This job

15   not only gave him the money but I guess, in a sense,

16   almost made him a man.  He could take care of his

17   family.  He could move him and his wife out of the

18   basement.  They could get an apartment on their own,

19   and he could pay for these fertility treatments, which

20   they're still trying to work through.

21           Then there's just the money.  Your Honor sees

22   people every day who did bad things for money, and this

23   is not different in that regard.  But I do think that

24   there are these other aspects to it that are mitigating

25   in nature.

1                  He's been only remorseful since the very

2     second he was arrested.  He put his money where his

3     mouth was in that regard and spoke to the government.

4     I mean, I know that some of the other defendants in

5     this case -- and I know the government's position is

6     that they weren't as culpable as Mr. Burke.  They

7     weren't as immediately remorseful either.  I mean,

8     some -- one defendant I'm thinking of in particular

9     pled guilty a week before trial.  That's his right, and

10    that happens from time to time.

11                 We didn't have that here.  He showed remorse.

12    He showed meaningful remorse by speaking to the

13    government off the bat.  He told the government flat

14    out:  I want to cooperate if you'll have me.  It turns

15    out the government doesn't need him or hasn't needed

16    him so far.  Then he pled guilty, really, at the

17    earliest opportunity.  Your Honor let him out of jail a

18    few months ago.  Remember, we had a bail hearing here.

19                 He's tried to understand why he did what he

20    did.  He's been seeing a therapist.  The therapist's

21    letters are in with the letters I gave to Your Honor.

22    He's volunteered at a religious charity.  He's tried to

23    come to terms with this.  This is an odd thing for me

24    to say I suppose, but he's really a fundamentally

25    honest person.

1          I think in his mind -- and I don't know what

2   the medical science turns out to be -- no one was

3   getting hurt.  Now, I know there's issues with the

4   Botox and the cold Botox and the not cold Botox.  But I

5   think in his mind for a long time, this was basically

6   beating -- the pharmaceutical companies had jacked up

7   prices, and this was a way of just getting the same

8   products less expensively.

9          Now, obviously, the Achilles' heel for us in

10  that argument could be viewed as the Botox issue, but I

11  don't think at the end of the day it is because there

12  really was a belief in the company that the Botox, even

13  if distributed in an uncool state, the worst that would

14  happen is that the Botox wouldn't work.

15         THE COURT:  Well, there were other cold chain

16  products in addition to Botox.

17         MR. AGNIFILO:  Yes, that's right, Judge.  But

18  I think the belief was that it would affect the

19  efficacy of the product, that it wouldn't hurt people.

20  I think that's key to his personal ethics.  I think he

21  does have a system of personal ethics.  I've gotten to

22  know him pretty well over the last several months, and

23  I think he would not do anything to hurt people.

24  That's not who he is.  That's just not who he is.

25         He was in this gray area, and he was in this

1  gray area heavy.  He continued to do this even after

2  the Gallant Pharma prosecution when he knew that it was

3  no longer a gray area, but so did all the defendants,

4  Judge.  All of the defendants in this, I mean, Your

5  Honor has looked at them and their individual

6  characteristics.

7        I think the similarities between Mr. Burke

8  and, say, David Stein, the similarities outweigh the

9  differences.  There's no -- Mr. Burke made more money.

10 That's the first thing that leaps out as a difference,

11 and that's because he was a salesman.  He was on

12 commission, and he made money from the commission.  He

13 sold a lot of product.  But at the end of the day,

14 David Stein -- I think it was $13 million of product

15 went through David Stein's basement, and David Stein

16 was changing labels.  David Stein knew everything about

17 the illegality of the business that Mr. Burke knew.

18        So I don't know that -- there's admittedly a

19 difference in degree, which is why when I thought what

20 a credible sentence would be for me to ask Your Honor

21 for, I came up with 18 months.  I don't think it would

22 be a credible sentence for me to ask for the same

23 sentence as David Stein.  I don't think you would view

24 that as a credible argument.  So I tried to find a way

25 of showing that, yes, we are worse, and we admit it.

1  So we're not asking for an 8-month sentence.  We're

2  asking for an 18-month sentence.

3            Here's why I think, one man thinks that's a

4  reasonable sentence.  Your Honor is the only one who

5  will impose sentence, and then that will be the

6  sentence.

7            I think what the government has done in this

8  case is actually critically important.  I think that

9  the government has a mission in this case, and I think

10  it's actually a good mission.  I think the mission that

11  they have in this case is to show the world that this

12  has to stop:  You can't do this anymore.  Everyone

13  should be on notice after the Gallant case, after this

14  case that this isn't a gray area and this isn't some

15  kind of licensing issue.  This is a crime.  We have the

16  FDA for a reason.  We have the safeguards we have in

17  this country for a reason.  I think the government has

18  done a very important job at getting that message out,

19  and the message is out.

20            I think an 18-month sentence for a salesman,

21  even a lucrative salesman, is a very significant

22  sentence.  It's a very significant sentence, I think,

23  as a matter of general deterrence.  I think it sends

24  the message out.  I think it shows in combination with

25  the forfeiture order that we're signing, in combination

1  with the fines to the corporation, I think, and with

2  the fact that -- and I salute the government for

3  arresting Tzvi Lexier and eventually going to bring him

4  to justice probably right in this courtroom.  So I

5  think the deterrent impact of this sentence is an

6  important goal of sentencing, and I think it's met by

7  an 18-month sentence, which is a significant sentence

8  generally.

9          In terms of a sentence for one man and his

10  family, it's a very significant sentence.  I mean, he's

11  trying to start his life.  His wife is here toward the

12  end over there.  They're a young couple.  They've

13  struggled.  They want to have a family.  They've tried

14  to have a family.  They've engaged in fertility

15  treatments to the cost of tens of thousands of dollars

16  to try to do that.

17          We all know David Burke is going to go to

18  jail at the end of today, but I think what seems fair

19  and right in a larger sense is that he do his jail term

20  and he come out not too much of an older man so that he

21  and his wife can get on with their lives and get on

22  with their family.  He has a lovely family.  They have

23  been supportive throughout.  His parents, his brothers,

24  sisters, everyone has been supportive throughout.  Many

25  of the letters are to Your Honor.

1          I just think that an 18-month sentence is a

2    sentence that is -- shows specific and general

3    deterrence.  It shows respect for the law.  I think it

4    shows all the things we needed to show under 3553(a).

5    It's certainly a serious sentence for Mr. Burke.  I

6    think it's a sentence that's consistent, in my personal

7    opinion, with the other sentences both in this case and

8    the Gallant case.  I think a sentence in excess of

9    that, I think, would be more heavily weighed against

10   Mr. Burke.  I think this sentence is in keeping with

11   the way that these cases have been sentenced.  I think

12   it sends the message that the government deserves sent

13   and the government wants sent.

14          So that's all I have, Judge.

15          THE COURT:  All right.  Counsel, I don't know

16   if you had completed what you wanted to say.  Is there

17   anything else?

18          MR. DWYER:  No, nothing further, Your Honor.

19          THE COURT:  All right.  Mr. Burke, you have

20   the opportunity to address the Court before it imposes

21   sentence.  Would you like to say anything, sir?

22          THE DEFENDANT:  Yes, Your Honor.

23          I just wanted to apologize to my family, my

24   friends, the Court for the embarrassment I've caused,

25   for the crime that I actively participated in, and just

1  an overall apology.  Over the last nine months, I have

2  had plenty of time to review this in my head and go

3  over and over.  There's really no excuse for what I

4  did.  Once again, I apologize.

5           THE COURT:  Why don't you have a seat.

6           This matter is before the Court for

7  sentencing in the case of *United States v. David Eli*

8  *Burke* with respect to his conviction on five counts,

9  including conspiracy, in violation of Title 18, United

10 States Code, Section 371, a Class D felony, punishable

11 up to 5 years, a $250,000 fine, a $100 special

12 assessment, and 3 years of supervised release;

13 smuggling goods into the United States, in violation of

14 Title 18, United States Code, Section 545, a Class C

15 felony, punishable by a term of up to 20 years, a

16 $250,000 fine, a $100 special assessment, and 3 years

17 of supervised release; introducing misbranded drugs and

18 devices in interstate commerce, in violation of

19 Title 21, United States Code, Sections 331(a) and

20 332(a)(2), a Class E felony, punishable up to 3 years

21 in prison, a $10,000 fine, 1 year of supervised

22 release; a conviction for unlicensed wholesale

23 distribution of prescription drugs, in violation of

24 Title 21, United States Code, Sections 331(t),

25 333(b)(1)(D), also a Class C felony, punishable up to

1  10 years, a $250,000 fine, 3 years of supervised

2  release; and conspiracy to commit money laundering, in

3  violation of Title 18, United States Code, Section

4  1956(h), a Class C felony, punishable up to 20 years in

5  prison, a $500,000 fine, a special assessment of $100,

6  and 3 years of supervised release.

7       This 34-year-old defendant was involved in

8  the illegal importation and distribution of misbranded

9  drugs for distribution and sale to doctors, medical

10  practices, and hospitals in the United States.  On

11  December 3, 2014, a 25-count indictment was issued

12  against him and others charging him in 17 counts

13  pertaining to the illegal importation and unlicensed

14  sale of misbranded drugs together with a notice of

15  forfeiture of over $18 million.  He was arrested in

16  Florida on December 24, 2014, and released on

17  February 18, 2015, in this district on personal

18  recognizance and conditions, which he has fully

19  complied with.  On March 9, 2015, he pled guilty to 5

20  of the 17 counts against him which the Court has just

21  identified.

22       The Court has reviewed and independently

23  determined the guideline sentence applicable to the

24  defendant and his offenses.  The defendant has filed a

25  number of objections to the guideline sentence as

1   calculated by Pretrial Services, and the Court will

2   consider those at this time.

3            First, the defendant objects to the reference

4   in paragraph 41 of the presentence report to a

5   March 20, 2013, e-mail from another coconspirator, Tzvi

6   Lexier, regarding a doctor complaining that five out of

7   ten patients went to the emergency room after suffering

8   side effects from Botox injections.  The objection is

9   on the grounds that the e-mail is not supported by any

10  evidence or corroboration.

11           The government has not provided in the face

12  of this objection any additional information in support

13  of the claims made in the e-mail, and there's no other

14  evidence in the presentence report that the defendant

15  at the time had received a copy of the e-mail or

16  otherwise knew the substance of the e-mail.  For that

17  reason, the Court will strike the reference in the

18  e-mail to paragraph 41 in the presentence report, and

19  the presentence report will be amended accordingly.

20           Second, with respect to a second objection,

21  the defendant objects to the assessment of a 4-level

22  enhancement pursuant to Section 3B1.1 for leaders and

23  organizers.  The Court has considered the arguments of

24  the defendant and the government, statement of facts,

25  and all other information available to the Court, as

1  well as the substance and commentary of that section

2  and concludes that while the defendant was not an

3  organizer of the conspiracy, owner of the corporate

4  defendants, or an ultimate decision maker, he was, in

5  fact, a commissioned salesperson.

6          He, nevertheless, engaged in activities

7  beyond that of a mere salesman.  Those activities

8  included activities of a managerial or supervisory

9  nature, including the training of various members of

10  the sales team, including training how to mislead

11  clients, instructing drop-shippers on when and how to

12  ship packages, including advising them to use false

13  names and addresses and to ship cold chain products at

14  room temperature.

15          For these reasons, the Court concludes that

16  an enhancement is appropriate but that the enhancement

17  should be 3 levels rather than 4 levels.

18          Third, the defendant objects to using the

19  total profits gained during the conspiracy for the

20  purposes of calculating the guidelines.  In that

21  regard, the defendant claims that the appropriate

22  amount to be used is the amount of his profits obtained

23  during his participation, which is approximately

24  $1.3 million, principally on the grounds that Lexier

25  did not inform him of the profitability of the business

1 overall and Burke had no independent ability to

2 determine that profitability.

3          Here the loss amount to be used under the

4 guidelines is that amount paid for the misbranded drugs

5 with no credit for the value of those items or

6 services.  Second, the loss amount attributable to any

7 particular defendant is that amount reasonably

8 foreseeable, that is that pecuniary harm that the

9 defendant knew under the circumstances, reasonably

10 should have known was a potential result of the

11 offense.

12          In this case, given the defendant's position

13 and the overall involvement with the sales activities

14 of the corporate defendants, the Court concludes that

15 under the structure of the sentencing guidelines and

16 the principles applicable to calculating the

17 guidelines, there is sufficient evidence that the

18 defendant was on notice of the overall business of the

19 corporate defendants.

20          For that reason, it is appropriate that the

21 overall gain that resulted from the offense be used to

22 calculate the guideline sentence even though he may not

23 have known or had access to the specific overall

24 profitability figures.  Nevertheless, as the Court will

25 discuss in a moment, the Court has considered and will

1  consider the amount of the actual gain that this

2  particular defendant obtained in assessing an overall

3  sentence.

4         So based on these rulings, the Court

5  calculates the guideline sentence as follows:  The base

6  level is 6 increased by 20 levels to reflect the total

7  gain as defined under the guidelines, an additional 2

8  levels because a significant part of the offense was

9  committed outside of the United States, an additional 2

10  levels for his conviction under Section 1956 of

11  Title 18, an addition 3 levels for his role resulting

12  in an overall offense level of 33.  The defendant has

13  accepted responsibility and, therefore, is entitled to

14  a 2-level reduction.  The government has moved for an

15  additional 1-level reduction based on his acceptance of

16  responsibility, which the Court grants, resulting in an

17  overall offense level of 30.

18         This is the defendant's first criminal

19  conviction and, therefore, he's in Category I.  The

20  guideline sentence for an offense level 30 and criminal

21  history I is 97 to 121 months.  The defendant is

22  eligible for probation under the statutory provision

23  but not under the guidelines.  Supervised release is

24  recommended of 1 to 3 years with a fine of $15,000 to

25  $150,000 with a $100 special assessment as to each of

1  the five counts.

2          The Court has also considered the sentencing

3  objectives under Section 3553 in light of all of the

4  information available to the Court in the presentence

5  report and the statement of facts.  In that regard, the

6  Court has considered the nature and seriousness of the

7  offense which involved a conspiracy that began in

8  approximately April 2011 and continued through the

9  defendant's arrest in December 2014 all for the

10 purposes of smuggling into the United States and

11 distributing within the United States misbranded

12 prescription drugs and devices.

13          The members of the conspiracy were located

14 both in Canada and the United States and purchased from

15 coconspiring foreign suppliers prescription drugs and

16 devices manufactured and labeled for use in foreign

17 countries, including Turkey, Canada, France, Italy, the

18 United Kingdom, and other countries.  They then caused

19 these drugs to be shipped into the United States, often

20 through circuitous routes to conceal the identity of

21 these drugs and their sources of supply.

22          These illegally imported drugs included

23 orthopedic injections, rheumatological infusions,

24 cosmetic devices, optomology products, and oncology

25 drugs, including numerous drugs that required

1   temperature controls during shipment and storage,

2   including such drugs as Botox and Lucentis, which is an

3   injectable prescription drug to treat macular

4   degeneration, as well as other drugs not approved for

5   use in the United States.

6           In order to avoid the regulatory functions of

7   the FDA, Customs and Border Protection, and Immigration

8   and Customs Enforcement-Homeland Security

9   Investigations, members of the conspiracy engaged in a

10  wide variety of actions to accomplish their illegal

11  purposes, including breaking up large shipments of

12  prescription drugs and devices into smaller packages to

13  be sent to the United States to multiple locations

14  under multiple names over multiple days to be

15  consolidated upon arrival after evading border

16  detection, shipping packages through the United

17  Kingdom-based services that allowed packages to be

18  delivered through the United States Postal Service with

19  less scrutiny, placing on Customs forms misleading

20  statements about the packages' contents and value, and

21  addressing packages to members of the conspiracy under

22  false names and titles.

23          There was frequent mishandling of

24  prescription drugs subject to strict temperature

25  requirements, such as cold chain products required to

1  be kept at a constantly low temperature for safe use

2  and failure to keep and provide appropriate records to

3  track the proper shipping and storage and transaction

4  history of drugs.

5           There also was the misbranding of these

6  smuggled and distributed prescription drugs, to include

7  inadequate directions for their use, the so-called FDA

8  black-box warnings, which are the strongest FDA

9  warnings required, as well as the required FDA approval

10 labels.  In some instances, the labels failed to bear

11 the required information in the English language.

12          Once in the United States, the drugs were

13 forwarded to doctors and medical practices or

14 alternative locations, including the personal

15 residences and mailboxes of conspiring individuals

16 known as drop-shippers in the United States.  These

17 drop-shippers regularly received packages of

18 prescription drugs and devices from abroad, removed

19 labels and other *indicia* showing that they had been

20 imported from abroad.  They repacked the orders and

21 reshipped them to doctors and medical practices

22 throughout the United States in order to give the false

23 impression that the drugs were being distributed

24 domestically and legally.

25          The drugs used for the storage and handling

1  of prescription drugs consisted of such things as
2  unregistered commercial mailboxes, as well as the
3  backyards of personal residences, porches, basement
4  rooms, garages, kitchens, and other areas of storage,
5  none of which had the required lighting, ventilation,
6  temperature, humidity, or security required for the
7  safe handling and storage of prescription drugs.
8         Neither the defendant nor any of his
9  codefendants were licensed to sell or distribute
10  prescription drugs within the United States.
11         Once funds were obtained from the illegal
12  distribution of drugs, they were deposited into bank
13  accounts of the corporate defendant.  Those funds were
14  then used to pay foreign suppliers of prescription
15  drugs, as well as commissions to the salespersons who
16  sold the drugs, as well as drop-shippers, and to the
17  owners of the corporate defendants.
18         As stated in the statement of facts, overall,
19  the conspiracy caused to be illegally imported and
20  distributed misbranded prescription drugs and devices
21  in the United States amounting to over $18 million;
22  although, the amount of $33 million has been cited in
23  related cases with this particular defendant receiving
24  personally approximately $1.3 million.
25         As stated in the statement of facts admitted

1  under oath by Mr. Burke, his role was to participate in

2  the day-to-day operations of the corporate defendants.

3  In that role in working with the owner of the corporate

4  defendants and others, he communicated with

5  coconspirators or sales representatives and

6  drop-shippers in the United States.  He tracked and

7  coordinated shipments from overseas into the United

8  States.  He called the United States-based customers to

9  sell prescription drugs and devices from abroad and

10 engaged in the illegal importation and sales of

11 misbranded drugs using false names in connection with

12 his activities.

13         There's no doubt that the defendant was

14 centrally involved in the overall operations of a

15 substantial and extensive illegal importation and

16 distribution scheme.  Whatever may have been the

17 defendant's initial assumptions about the legality of

18 what he was doing, there's no doubt that he quickly

19 understood what he was doing was improper and illegal

20 and continued and expanded his activities nonetheless

21 over time with what would appear to be rather

22 comprehensive knowledge concerning the overall scope

23 and operation of the scheme.

24         The Court also has no doubt that the

25 defendant's activities substantially contributed to the

1  ability of these corporate defendants and others to

2  successfully import and distribute these misbranded and

3  improperly transported and stored drugs, that he did so

4  knowing that what he was doing was illegal, and that as

5  a result, he knowingly and substantially contributed to

6  the distribution of drugs and devices that threatened

7  the public safety.

8           As to the defendant's personal history and

9  characteristics, this is the defendant's first

10 involvement in the criminal justice system, and the

11 Court has considered the extensive information and

12 material that has been provided to it concerning his

13 mental health issues, his educational, vocational, and

14 employment histories and capabilities, including the

15 many letters it has received from family and friends

16 that have spoken to his many good aspects.

17          It's against this information the Court has

18 considered the guideline sentence and the extent to

19 which it would appropriately reflect the level of

20 culpability of this particular defendant.  In that

21 regard, the Court has considered the guideline sentence

22 was substantially driven by the $18 million figure used

23 to calculate the loss amount even though the loss

24 amount does not reflect any particular loss.  The Court

25 has also considered that in other contexts, the

1  defendant's gain of approximately $1.3 million would be

2  used to calculate the guideline sentence.  The Court

3  has considered that guideline sentence were it

4  calculated on that basis.

5         The Court has also considered the public

6  interest in this case, which includes both the need for

7  general and specific deterrence.  With respect to

8  specific deterrence, the Court has considered the

9  defendant's background and prospects for recidivist

10  behavior, which the Court considers very low.

11         With respect to general deterrence, the Court

12  has considered, as I indicated, the public interest and

13  the role the defendant played within that scheme, the

14  dangers presented to the public by the distribution of

15  these drugs in the fashion that they were, and the

16  defendant's substantial role in the sales and

17  distribution of those drugs, including the volume of

18  drugs, the length of time he performed those

19  activities, his continued involvement in those

20  activities after clear and unmistakable warnings that

21  his activities were illegal, as well as the extent to

22  which others had assisted in his efforts.

23         The Court has also considered that while

24  there were occasional counterfeit drugs, these drugs

25  were for the most part drugs that had been manufactured

1  by the respective pharmaceutical companies and were not

2  counterfeit drugs. But having said that, the Court has

3  also considered that the manner in which these drugs

4  were shipped and treated gives little comfort to the

5  Court that the activities were any less dangerous than

6  they were.

7        The Court has also considered the public

8  interest in terms of alternative sentences that can

9  satisfy the sentencing objectives and also the public

10  interest in fashioning a sentence that allows this

11  first-time offender to rejoin the community and his

12  family within a reasonable period of time and resume

13  what the Court has every confidence can be a productive

14  and law-abiding life.

15        The Court has considered in that regard the

16  defendant's age, as well as the need to avoid

17  unwarranted sentencing disparities. In that regard,

18  the Court has considered the defendant's level of

19  culpability relative to others in the conspiracy, the

20  sentences already imposed on coconspirators, and the

21  sentences imposed in other cases of this type within

22  this court and elsewhere. The Court has also

23  considered the defendant's acceptance of

24  responsibility, as well as his immediate cooperation.

25        At the end of the analysis, the Court is

1  faced with a defendant who has obtained substantial

2  benefit through a fraudulent scheme that itself had

3  posed substantial damages or substantial risks and

4  threats to the safety of the public, and the Court has

5  considered sentences in other cases that have similar

6  characteristics.

7          The Court is in a position to impose sentence

8  at this time.

9          Mr. Burke, would you come to the podium,

10  please.

11          Mr. Burke, it will be the sentence of this

12  Court you be committed to the Bureau of Prisons for a

13  period of 26 months following which you'll be placed on

14  1 year of supervised release.  The Court will not

15  impose a fine at this time in light of your forfeiture

16  obligation.  The Court will impose a $500 special

17  assessment for each of the counts.  The sentence and

18  the supervised release of 1 year applies to each of the

19  5 counts and will be served concurrently.  That will be

20  the sentence of the Court.

21          Is there anything further?

22          MR. AGNIFILO:  Thank you.

23          THE DEFENDANT:  Thank you.

24          MR. DWYER:  Your Honor, the government has a

25  joint order of forfeiture which has been signed by the

1  defendant, as well as defense counsel.

2        (Documents are handed up to the Court.)

3            MR. AGNIFILO:  Your Honor, the only issue is

4  I believe we're trying to effect a change in the bond.

5  Mr. Burke's sister -- and she wrote a letter to this.

6            THE COURT:  I've seen it.  The third-party

7  custodian needs to be changed?

8            MR. AGNIFILO:  Yes.

9            THE COURT:  All right.  Any objection by the

10 government on that?

11           MR. DWYER:  No, Your Honor.

12           THE COURT:  Mr. Burke, come to the podium.

13           I'm going to allow you to voluntarily

14 surrender at a time and place to be designated to you

15 by the Bureau of Prisons through the Pretrial Services

16 and Probation office under whose supervision you'll

17 continue.

18           I'm also going to modify the conditions of

19 your bond to change the third-party custodian from your

20 sister to I believe --

21           What's the name of the individual?

22           THE DEFENDANT:  Aaron and Daniella Schwartz.

23           THE COURT:  -- Ms. Schwartz, who has been

24 reviewed and approved by Pretrial Services.  You'll

25 remain under her custody until reporting to the Bureau

 1  of Prisons.

 2          THE DEFENDANT:  Yes.  Thank you.

 3          MR. AGNIFILO:  Would Your Honor consider

 4  recommending Otisville?

 5          THE COURT:  In New York?

 6          MR. AGNIFILO:  Yes, Judge.

 7          THE COURT:  Yes.  The Court will make that

 8  recommendation to the Bureau of Prisons if it's

 9  available and appropriate.

10          MR. AGNIFILO:  Thank you, Judge.  I

11  appreciate it.

12          THE COURT:  All right.  Anything else?

13          MR. DWYER:  Nothing from the government, Your

14  Honor.

15          THE COURT:  All right.  Counsel and the

16  defendant are excused.

17          The Court will stand in recess.

18          -----------------------------------
                      Time:  9:50 a.m.
19

20

21

        I certify that the foregoing is a true and
22
     accurate transcription of my stenographic notes.
23

24
                              _____
                                     /s/
25                            Rhonda F. Montgomery, CCR, RPR


        Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599